JUDGE OETKEN

12 CIV 0583

RECEIVED
JAN 24 2012
U.S.D.C. S.D.N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTICT OF NEW YORK**
-------------------------------------------------------x

BRETTON J. BOLT
1701 Pontiac Road SE
East Grand Rapids, Michigan 49506

        Plaintiff,

   - against -

FRANCIS P. KIRLEY
12834 Amber Woods Way
Sykesville, Maryland 21784

     and

NEXION HEALTH, INC.
6937 Warfield Avenue
Sykesville, Maryland 21784

<u>Serve on</u>:  Francis P. Kirley, President and CEO

       Defendants.
-------------------------------------------------------x

Civil Action No. _____

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiff Bretton J. Bolt ("Bolt"), by and through his undersigned attorneys, derivatively and directly sues Francis P. Kirley ("Kirley") – in both his corporate and personal capacities – and Nexion Health, Inc. ("Nexion" or "the Company") and states:

**Parties, Jurisdiction and Venue**

    1.    Bolt is an individual who resides in East Grand Rapids, Michigan.

    2.    Kirley is an individual who resides in Sykesville, Maryland.

    3.    Nexion is a Delaware corporation with its principal place of business in Sykesville, Maryland.  Nexion is a short-term and long-term medical care and rehabilitation services provider with over 3,500 employees and approximately 41 campuses in Colorado, Louisiana and Texas.  In 2010, Nexion earned revenues in excess of $220,000,000.

4.      This Court has personal jurisdiction over Bolt, Kirley and Nexion insofar as they consented to personal jurisdiction in this Court in an August 31, 2000 Stockholders Agreement on which this Complaint is premised (at least in part) – a true and correct copy of which is attached hereto as Exhibit A.  Ex. A at 16.[1]

5.      Venue is similarly proper in this Court insofar as the parties consented to same in the August 31, 2000 Stockholders Agreement.  *See id.*

6.      The Court has subject-matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1332 insofar as this dispute is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## Factual Background

7.      Kirley is and at all relevant times has been the President, Chief Executive Officer ("CEO") and  majority shareholder  of Nexion.   Kirley  currently  owns  and has  continuously owned at least 425,000 of Nexion's 698,000 issued and outstanding shares of stock since May 2002.  He is and at all relevant times has been a director of Nexion as well.  As of the filing of this Complaint, Kirley is Nexion's only director.

8.      Bolt was the Executive Vice President, Chief Financial Officer and Secretary of Nexion, as well as a director of Nexion, until resigning from these positions in May 2011.  Bolt last worked at Nexion on July 15, 2011.  Bolt currently owns and at all relevant times has owned at least 245,000 shares of Nexion stock.

9.      From 2006 to the present, Kirley has dominated and exercised *de facto* control over the affairs of Nexion as the President, CEO and majority shareholder of the Company.  He is now and has been since May 2011 the sole director of Nexion.

---

[1]      The parties to the August 31, 2000 Stockholders Agreement are Triumph Health, Inc., Francis P. Kirley and Bretton J. Bolt.  Triumph Health, Inc. was later renamed Nexion Health,

10.     In 2007, Kirley and Bolt discussed Bolt's desire to leave Nexion and to sell his minority shareholder interest in the Company.  In connection with that discussion, Kirley asked Bolt to give him a figure at which Bolt would agree to sell his minority interest in Nexion.  Bolt did so but Kirley never responded to Bolt's buyout offer and so Bolt remained with Nexion as an officer and minority shareholder.  Unbeknownst to Bolt, however, Kirley was at the same time pursuing on his own personal behalf at that time Nexion business opportunities.

Derivative Allegations

11.     Bolt brings this Complaint both individually and derivatively in the right and for the benefit of Nexion to redress injuries suffered, and to be suffered, by Nexion as a direct result of Kirley's breaches of fiduciary duties, gross negligence and unjust enrichment, among other things.  Nexion is a nominal defendant herein and is a defendant solely in a derivative capacity.

12.     Bolt has been a continuous owner of Nexion common stock at all relevant times and he continues to own Nexion stock at this time.

13.     Bolt has not engaged in and is not engaging in any collusion to confer jurisdiction that this Court would otherwise lack.

14.     Bolt will adequately and fairly represent the interests of Nexion and its shareholders in enforcing and prosecuting their rights.

15.     Prosecution of this action independently of Nexion's board of directors is in the best interests of the Company.

16.     As described in greater detail in Paragraphs 39 through 41 below, Bolt sent a demand letter on October 21, 2011 to Kirley – in his capacities as President and CEO, majority shareholder and the sole director of Nexion – demanding that Kirley and Nexion take action to remedy the misappropriation of corporate opportunities, self-dealing, corporate waste, and other

Inc.

BA2/431432v6

breaches and illegal and unjust conduct alleged below.  Nexion responded to Bolt's October 21

demand letter in a December 12, 2011 letter from Nexion's General Counsel, Brian P. Lee, in

which Mr. Lee dismissed all of Bolt's demands as unfounded.

<u>The Texas Pharmacy Opportunity</u>

17.     In 2007, while Kirley was the President and CEO and majority shareholder of

Nexion, Kirley formed Maryland Pharmacy Holdings II, LLC.

18.     Bolt was initially included in draft paperwork relating to the formation of

Maryland Pharmacy Holdings, II, LLC, but he was later excluded and he was never advised that

Kirley had actually formed Maryland Pharmacy Holdings, II, LLC.

19.     Maryland Pharmacy Holdings II, LLC subsequently paid $105,000 to acquire an

approximately 52% ownership interest in a Texas pharmacy known as National Pharmacy of

Texas LLC ("the Texas Pharmacy Opportunity"), which began operating in September 2007.

Kirley owns an 80% interest in Maryland Pharmacy Holdings II, LLC.

20.     Kirley acquired the Texas Pharmacy Opportunity without first making it available

to Nexion and without disclosing their acquisition of the Texas Pharmacy Opportunity to Bolt.

21.     The Texas Pharmacy Opportunity was one in which Nexion and its shareholders

had an interest or tangible expectancy.

22.     The Texas Pharmacy Opportunity was one that Nexion was financially able to

pursue and would have pursued.

23.     As President and CEO and as the majority shareholder of Nexion, Kirley has

caused Nexion to do substantial business with National Pharmacy of Texas LLC since its

formation in September 2007 to his own personal financial benefit and to the detriment of Nexion

and its shareholders.

BA2/431432v6

### The Louisiana Hospital Opportunity

24.     In 2006 or 2007, while Kirley was the President and CEO and majority shareholder of Nexion, Kirley formed another limited liability company that acquired an ownership interest in Red River Behavioral Hospital, LLC, an approximately 30-bed inpatient psychological hospital in Shreveport, Louisiana ("the Louisiana Hospital Opportunity").

25.     Kirley did not offer the Louisiana Hospital Opportunity to Nexion before the limited liability company that Kirley formed acquired an ownership interest in Red River Behavioral Hospital, LLC and Kirley did not disclose to Bolt the Louisiana Hospital Opportunity.

26.     The Louisiana Hospital Opportunity was one in which Nexion and its shareholders had an interest or tangible expectancy.

27.     The Louisiana Hospital Opportunity was one that Nexion was financially able to pursue and would have pursued.

28.     Kirley has benefitted and profited from the Louisiana Hospital Opportunity to the exclusion of Nexion and its shareholders.

29.     On information and belief, while the President and CEO and majority shareholder of Nexion, Kirley has misappropriated for his own personal benefit and profit and for the benefit and profit of his family, friends and acquaintances, other potential Nexion business opportunities, including without limitation a mobile x-ray imaging business.  Kirley has also failed to allow Nexion to pursue these potential business opportunities and has failed to advise Nexion's minority shareholders – including Bolt – of same.

30.     On information and belief, while the President and CEO and majority shareholder of Nexion, Kirley has engaged in and has profited personally from self-dealing in addition to that

BA2/431432v6

described above, including without limitation by directing that Nexion patronize businesses in which Kirley holds a personal financial interest.

31.     On information and belief, while the President and CEO and majority shareholder of Nexion, Kirley has misappropriated Nexion employee time and funds for his own personal business and pleasure, including without limitation (a) using Nexion funds or receiving reimbursements from Nexion for travel for non-Nexion business or pleasure, (b) devoting substantial Nexion employee time to Kirley's family affairs and (c) using Nexion funds for his personal entertainment.

<u>Kirley's Failure to Complete the Acquisition</u>

32.     After months of negotiating a potential acquisition of Nexion, Kirley (on behalf of Nexion) signed a Term Sheet, the contents of which Nexion and the company seeking to acquire Nexion ("the Purchaser") elected to remain confidential.

33.     The Purchaser was uniquely and financially able to complete the acquisition of Nexion and the proposed acquisition came at a particularly opportune time for Nexion and its shareholders.

34.     Kirley never presented the Term Sheet or even the Purchaser's interest in acquiring Nexion to Nexion's board or its shareholders.

35.     After executing the Term Sheet, Kirley failed to exercise reasonable business judgment, including without limitation failing to take any further steps reasonably appropriate and necessary according to the Term Sheet and failing to take any further steps to complete the Purchaser's acquisition.

36.     Rather, again without submitting the decision for approval by Nexion's board or its shareholders, Kirle y unilaterally elected not to proceed with the Purchaser's acquisition.

Kirley's decision in this regard was motivated by his own personal interests and, indeed, Kirley was so conflicted that he was unable to exercise reasonable business judgment concerning the Purchaser's acquisition.

37.     In electing not to proceed with the Purchaser's acquisition, Kirley let his personal interests take precedence over the interests of Nexion and its shareholders.  Personal concerns including without limitation Kirley's unwillingness to relinquish his position as CEO of Nexion and Kirley's individual interests in the Texas Pharmacy Opportunity and the Louisiana Hospital Opportunity caused Kirley to decline the Purchaser's acquisition contrary to the best interests of Nexion and its shareholders, including Bolt.

38.     Kirley's unreasonable failure to take the steps required by the Term Sheet and to complete the Purchaser's acquisition cost Nexion and its shareholders tens of millions of dollars.

<u>Nexion Stockholders Agreement/Bolt Demand to Nexion</u>

39.     Article 5 of the August 31, 2000 Stockholders Agreement among Nexion, Kirley and Bolt (a true and correct copy of which is attached hereto as Exhibit A) provides, among other things, that Nexion shall make available to its shareholders quarterly financial statements and annual consolidated statements of income and balance sheets, as well as "such other information as any Shareholder may reasonably request." Ex. A at 13-14.  The Stockholders Agreement also provides that shareholders like Bolt shall have access to Nexion's books and records, including "the corporate, financial and operating records of the Company." *Id.* at 14 -15.

40.     Bolt sent a demand letter to Kirley, as President and CEO, majority shareholder and the sole director of Nexion, on October 21, 2011.  In the letter, Bolt demanded (among other things) that Nexion take action in response to Kirley's breaches of his fiduciary duties to Nexion and its shareholders and his self-dealing.  Bolt further demanded that Kirley provide him an

- 7 –

accounting and access to certain Nexion information, documents and records. To further deny him access to information to which he was entitled, Kirley instructed Nexion's employees not to communicate with Bolt. Nexion responded to Bolt's October 21 demand letter in a December 12, 2011 letter from Nexion's General Counsel, Brian P. Lee. In that letter, Mr. Lee dismissed Bolt's demands as "unfounded," "without merit" and "unjustified," among other things. Mr. Lee also refused to provide the accounting that Bolt requested and similarly refused to provide much of the information that Bolt had requested, except for quarterly financial information.

41.     Bolt's October 21 demand letter reasonably requested information to which Bolt is entitled under the Stockholders Agreement and to which Bolt was privy in his previous capacity as Executive Vice President, Chief Financial Officer and Secretary of Nexion. Nexion's General Counsel's refusal in his December 12, 2011 letter to provide this information is unreasonable, unjustified and contrary to law and the terms of Article 5 of the Stockholders Agreement.

42.     Insofar as Nexion is an S-corporation and, as such, passes corporate income, losses, deductions and credits through to its shareholders for federal tax purposes, Bolt has a particularly crucial need for the information requested in his October 21 demand letter.

## COUNT I

### Breach of Fiduciary Duties

43.     Bolt adopts and incorporates by reference Paragraphs 1 through 42 above as if fully set forth herein.

44.     As a director and officer of Nexion at all times relevant hereto, Kirley owed and still owes to Nexion and its shareholders fiduciary duties of care, loyalty, candor and good faith.

- 8 -

45.   Kirley's duties of care and loyalty prohibit him from placing his personal interests ahead of the interests of Nexion and its shareholders, including without limitation prohibiting him from usurping corporate opportunities and engaging in self-dealing transactions.

46.   Kirley's duties of care and loyalty require him to provide competent and active management of Nexion and its affairs.

47.   Kirley's duty of good faith requires him, among other things, to act first and foremost in the best interests of Nexion and its shareholders.

48.   Kirley breached his fiduciary duties to Nexion and its shareholders by, among other things, taking for his own personal benefit (and to the exclusion of Nexion and its shareholders) the Texas Pharmacy Opportunity, the Louisiana Hospital Opportunity, and the mobile x-ray imaging business.

49.   Kirley further breached his fiduciary duties to Nexion and its shareholders by, among other things, engaging in self-dealing and causing Nexion to do business with entities – such as National Pharmacy of Texas LLC, among others – in which he has a personal financial interest.

50.   Kirley still further breached his fiduciary duties to Nexion and its shareholders by failing to provide the competent and active management reasonably necessary to complete the Purchaser's acquisition.

51.   Kirley still further breached his fiduciary duties to Nexion and its shareholders by misappropriating Nexion employee time and funds for his own personal business and pleasure, including without limitation using Nexion funds or receiving reimbursements from Nexion for travel for pleasure or non-Nexion business, devoting substantial Nexion employee time to Kirley's family affairs and using Nexion funds for personal entertainment.

52.     As a proximate result of any or all of the breaches set forth above, Kirley committed corporate waste and Nexion's stock lost value or failed to increase in value.  As a further proximate result of same, Nexion and its shareholders, including Bolt, were damaged.

53.     Accordingly, Nexion and its shareholders, including Bolt, are entitled to legal and equitable remedies, as set forth below.

## COUNT II

### Unjust Enrichment

54.     Bolt adopts and incorporates by reference Paragraphs 1 through 53 above as if fully set forth herein.

55.     Kirley has benefitted and profited from: (a) the corporate opportunities he misappropriated from Nexion – including without limitation the Texas Pharmacy Opportunity, the Louisiana Pharmacy Opportunity, and the mobile x-ray imaging business; (b) his self-dealing through Nexion; (c) his failure to consummate the Purchaser's acquisition; and (d) his misappropriation of Nexion employee time and funds for his own personal business and pleasure.

56.     Kirley is aware of these benefits and profits and has unjustly failed to compensate Nexion and its shareholders (including Bolt) for them.

57.     Kirley's acceptance and retention of these benefits and profits without compensating Nexion and its shareholders for their fair value is inequitable and must be remedied by imposition of a constructive trust for the benefit of Nexion and its shareholders (including Bolt).

– 10 –

BA2/431432v6

## COUNT III

### Breach of Stockholders Agreement

58.     Bolt adopts and incorporates by reference Paragraphs 1 through 57 above as if fully set forth herein.

59.     The August 31, 2000 Stockholders Agreement among Nexion, Kirley and Bolt contractually obligates Nexion and Kirley to make available to Nexion's shareholders (including Bolt) quarterly financial statements and annual consolidated statements of income and balance sheets, as well as "such other information as any Shareholder may reasonably request." Ex. A at 13-14.  The Stockholders Agreement also contractually obligates Nexion and Kirley to allow shareholders like Bolt access to Nexion's books and records, including "the corporate, financial and operating records of the Company." *Id.* at 14 -15.

60.     Bolt in his October 21, 2011 demand letter reasonably requested from Nexion and Kirley, among other things, information that Nexion and Kirley are required by the Stockholders Agreement to provide to Bolt.

61.     In breach of the Stockholders Agreement, General Counsel for Nexion in his December 12, 2011 letter refused to provide to Bolt some or all of this information.  Kirley has similarly refused to provide this information.

62.     As a proximate result of Nexion's and Kirley's breach of the Stockholders Agreement, Bolt has been damaged, including without limitation being denied access to information to which he is legally and equitably entitled.

WHEREFORE, Plaintiff Bolt demands:

(a)     Compensatory damages in an amount of $20,000,000;

BA2/431432v6

(b)      A temporary restraining order and preliminary injunction sufficient to prevent Kirley from engaging in any further usurpation of corporate opportunities, any further self-dealing, and any further misuse of Nexion corporate assets for personal business or pleasure;

(c)      A permanent injunction to prevent Kirley from engaging in any further usurpation of corporate opportunities, any further self-dealing, and any further misuse of Nexion corporate assets for personal business or pleasure;

(d)      A constructive trust for the benefit of Nexion as to all profits Kirley has realized in the past and will realize in the future from (i) the corporate opportunities he misappropriated from Nexion – including without limitation the Texas Pharmacy Opportunity and the Louisiana Hospital Opportunity , (ii) his self-dealing through Nexion, (iii) his failure to consummate the Purchaser's acquisition, and (iv) his misappropriation of Nexion employee time and funds for his own personal business and pleasure;

(e)      An Order directing Nexion to provide all of the information requested in Bolt's October 21, 2011 demand letter;

(f)      An Order directing Kirley to provide to Bolt a current and complete accounting of his net income from any business in which Kirley holds any ownership interest, including without limitation Nexion, Maryland Pharmacy Holdings II, LLC, Kirley Capital Investments, LLC and Kirley Capital Investments II, LLC;

(g)      Bolt's attorneys' fees and costs associated with these proceedings; and

(h)      Such other and further relief as in equity and justice Bolt may be entitled to receive.

Respectfully submitted,

_Mik Mcfadden_

– 12 –

Michael K. Madden
Matthew T. Murnane (*pro hac vice* pending)
VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas, 25th Floor
New York, New York 10020
Telephone: (212) 307-5500

*Attorneys for Plaintiff Bretton J. Bolt*

## <u>VERIFICATION</u>

I, Bretton J. Bolt, hereby verify under the penalty of perjury that I am the Plaintiff in the

captioned action and that the facts set forth in this Verified Complaint are true and correct to the

best of my knowledge, information and belief.

Executed this 22nd day of January, 2012.

_____
Bretton J. Bolt

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTICT OF NEW YORK**
--------------------------------------------------------x
BRETTON J. BOLT

1701 Pontiac Road SE
East Grand Rapids, Michigan 49506

             Plaintiff,

        Civil Action No. _____

    - against -

FRANCIS P. KIRLEY
12834 Amber Woods Way
Sykesville, Maryland 21784

           **JURY DEMAND**

      and

NEXION HEALTH, INC.
6937 Warfield Avenue
Sykesville, Maryland 21784

Serve on:  Francis P. Kirley, President and CEO

           Defendants.
--------------------------------------------------------x

Plaintiff Bretton J. Bolt, by and through his undersigned attorneys, hereby demands a trial

by jury on all issues in this action triable to a jury.

         Respectfully submitted,

         _Michael K. Madden_
         Michael K. Madden
         Matthew T. Murnane (*pro hac vice* pending)
         VENABLE LLP
         Rockefeller Center
         1270 Avenue of the Americas, 25th Floor
         New York, New York 10020
         Telephone: (212) 307-5500

         *Attorneys for Plaintiff Bretton J. Bolt*

BA2/431432v6

# EXHIBIT A

STOCKHOLDERS AGREEMENT

AMONG

TRIUMPH HEALTH, INC.,

FRANCIS P. KIRLEY

AND

BRETTON J. BOLT

DATED AS OF AUGUST 31, 2000

NYB 465538 06432 00653

# TABLE OF CONTENTS

Page

Article 1.   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Article 2.   TRANSFER OF SHARES . . . . . . . . . . . . . . . . . . 7
2.1   Legends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
2.2   After-Acquired Shares . . . . . . . . . . . . . . . . . . . . . 8
2.3   Transfers - Compliance With Agreement . . . . . . . . . 8
2.4   Shareholder Transfers - Acceptance of Agreement . . . . 8
2.5   Involuntary Transfer of Shares . . . . . . . . . . . . . . . 8
2.6   Right of First Refusal . . . . . . . . . . . . . . . . . . . . . 10
2.7   Tag-Along Rights . . . . . . . . . . . . . . . . . . . . . . . . . 12
2.8   Drag-Along Rights. . . . . . . . . . . . . . . . . . . . . . . . . 13
2.9   Transfers by Founders. . . . . . . . . . . . . . . . . . . . . 14
2.10   Salary Increases and Bonuses for the Founders and Certain Officers. . . 14

Article 3.   PREEMPTIVE RIGHTS . . . . . . . . . . . . . . . . . . . . 14

Article 4.   BOARD OF DIRECTORS . . . . . . . . . . . . . . . . . . 15
4.1   Composition of Board of Directors . . . . . . . . . . . . . . 15

Article 5.   OTHER AGREEMENTS AND COVENANTS . . . . . . . . 15
5.1   Financial Statements . . . . . . . . . . . . . . . . . . . . . . 15
5.2   Books and Records; Inspection of Property . . . . . . . . 16
5.3   Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Article 6.   MISCELLANEOUS PROVISIONS. . . . . . . . . . . . . . 17
6.1   Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.2   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.3   Successors; Beneficiaries . . . . . . . . . . . . . . . . . . . 17
6.4   Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.5   Intentionally Omitted . . . . . . . . . . . . . . . . . . . . . . 17
6.6   Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
6.7   Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
6.8   Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . 18
6.9   Conflicts with Certificate of Incorporation or By-Laws . . . . 18
6.10   Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
6.11   Cost and Expenses . . . . . . . . . . . . . . . . . . . . . . . 19
6.12   Waiver and Consent . . . . . . . . . . . . . . . . . . . . . . 19
6.13   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
6.14   Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## STOCKHOLDERS AGREEMENT

THIS STOCKHOLDERS AGREEMENT (this "Agreement") is entered into as of August 31, 2000, among TRIUMPH HEALTH, INC., a Delaware corporation (the "Company"), FRANCIS P. KIRLEY ("Kirley") and BRETTON J. BOLT ("Bolt," together with Kirley, the "Founders"), and any other Person(s) which becomes a party to or otherwise bound by this Agreement pursuant to the terms hereof (together with the Founders, collectively, the "Shareholders").

WHEREAS, the Company is duly organized and validly existing under the laws of the State of Delaware and is authorized to issue one million (1,000,000) shares of common stock, par value $.01 per share ("Common Stock");

WHEREAS, each Shareholder owns the number of shares of Common Stock set forth on Schedule 1 hereto; and

WHEREAS, the Shareholders and the Company desire to set forth in this Agreement certain rights and responsibilities of the Company and the Shareholders.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth below, the parties hereto agree as follows:

Article 1.      DEFINITIONS.

For purposes of this Agreement, the following terms shall have the following meanings:

"Additional Shares" shall have the meaning set forth in Article 3 of this Agreement.

"Advisor" shall have the meaning set forth in Section 2.6(e) of this Agreement.

"Affiliate" shall mean, with respect to a given Person, (i) any other Person directly or indirectly controlling, controlled by or under common control with such given Person and (ii) any officer, director, partner or employee of such given Person.

"Agreement" shall mean this Stockholders Agreement as the same may be amended or modified from time to time hereafter.

"Board" shall mean the Board of Directors of the Company.

"Business Day" shall mean any day, other than a Saturday, Sunday or legal holiday, on which banks in New York, New York, and in the location of the office of the Company are open for business.

"By-Laws" shall mean the by-laws of the Company, as the same may be amended from time to time.

"Certificate of Incorporation" shall mean the certificate of incorporation of the Company, as the same may be amended from time to time.

"Commission" shall mean the United States Securities and Exchange Commission (or any other federal agency then administering the Securities Act).

"Common Stock" shall have the meaning set forth in the first whereas clause of this Agreement.

"Company" shall have the meaning set forth in the first paragraph of this Agreement.

"Consultant" shall have the meaning set forth in Section 2.5(e) of this Agreement.

"Continuing Shareholder" shall have the meaning set forth in Section 2.5(a) of this Agreement.

"Excess Offered Shares" shall have the meaning set forth in Section 2.6(d) of this Agreement.

"Excess Transferred Shares" shall have the meaning set forth in Section 2.5(b) of this Agreement.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, or any similar federal statute, and the rules and regulations of the Commission (or of any other federal agency then administering the Exchange Act) thereunder, all as shall be in effect from time to time.

"Founders" shall have the meaning set forth in the first paragraph of this Agreement.

"Fully Diluted" shall mean, with respect to the calculation of a number of shares of Common Stock, all shares of Common Stock outstanding at the time of determination and all shares issuable with respect to stock options, other warrants, convertible or exchangeable securities or otherwise.

NYB 465538 06432 00653

–2–

"Initial Public Offering" shall mean the completion of the first sale (whether by the Company or by any Shareholders) of Shares pursuant to a widely dispersed, underwritten public offering (whether in or outside the United States) in which, immediately following such offering, an amount equal to at least fifteen percent (15%) of the Shares that are issued and outstanding immediately following such offering have been sold in underwritten public offerings.

"Involuntary Transfer" shall mean any transfer, proceeding or action (other than a transfer complying with the provisions of Section 2.6 or Article 3) by or as a result of which a Shareholder shall be deprived or divested of any right, title or interest in or to any of the Shares, including without limitation any seizure under levy of attachment or execution, any transfer in connection with bankruptcy (whether pursuant to the filing of a voluntary or an involuntary petition under the Federal Bankruptcy Code) or other court proceeding to a debtor-in-possession, trustee in bankruptcy or receiver or other officer or agency, any transfer pursuant to a separation agreement or the entry of a final court order in a divorce proceeding from which there is no further right of appeal, any transfer upon or occasioned by the death of any Shareholder, or any transfer to a legal representative of any Shareholder.

"Involuntary Transferee" shall have the meaning set forth in Section 2.5(a) of this Agreement.

"Involuntary Transferor" shall have the meaning set forth in Section 2.5(a) of this Agreement.

"Litchfield" shall mean The Litchfield Companies, L.L.C.

"Litchfield Note" shall mean the Senior Subordinated Note, dated as of August 31, 2000, by the Company in favor of Litchfield in an aggregate principal amount up to Two Million Dollars ($2,000,000).

"Litchfield Warrant" shall mean the Warrant, dated as of August 31, 2000, issued to Litchfield, pursuant to which Litchfield is entitled to purchase two hundred thousand (200,000) shares of Common Stock, subject to the terms and conditions contained therein.

"LLGM" shall mean LeBoeuf, Lamb, Greene & MacRae, L.L.P.

"LLGM Warrant" shall mean the Warrant, dated as of August 31, 2000, issued to LLGM, pursuant to which LLGM is entitled to purchase thirty thousand (30,000) shares of Common Stock, subject to the terms and conditions contained therein.

"Non-Offering Shareholder" shall have the meaning set forth in Section 2.6(a) of this Agreement.

"Offer" shall have the meaning set forth in Section 2.6(a) of this Agreement.

"Offered Shares" shall have the meaning set forth in Section 2.6(a) of this Agreement.

"Offering Shareholder" shall have the meaning set forth in Section 2.6(a) of this Agreement.

"Offering Shareholder's Notice" shall have the meaning set forth in Section 2.6(b) of this Agreement.

"Offering Shareholder Valuation" shall have the meaning set forth in Section 2.6(b) of this Agreement.

"Opinion" shall have the meaning set forth in Section 2.5(e) of this Agreement.

"Other Transaction Documents" shall have the meaning set forth in the Purchase Agreement.

"Participating Offeree" shall have the meaning set forth in Section 2.7(a) of this Agreement.

"Participation Notice" shall have the meaning set forth in Section 2.7(a) of this Agreement.

"Participation Securities" shall have the meaning set forth in Section 2.7(a) of this Agreement.

"Person" shall mean any individual, partnership, corporation, limited liability company, joint venture, trust or other entity.

"Purchase Agreement" shall mean the Subordinated Note and Warrant Purchase Agreement, dated as of August 31, 2000, between the Company and Litchfield.

"Sale Request" shall have the meaning set forth in Section 2.8(a) of this Agreement.

"Section 2.6(e) Valuation" shall have the meaning set forth in Section 2.6(e) of this Agreement.

"Securities Act" shall mean the Securities Act of 1933, as amended, or any similar federal statute, and the rules and regulations of the Commission (or any other federal agency then administering the Securities Act) thereunder, all as shall be in effect from time to time.

"Seller" shall have the meaning set forth in Section 2.8(a) of this Agreement.

"Shareholders" shall have the meaning set forth in the first paragraph of this Agreement.

"Shares" shall mean the issued and outstanding shares of Common Stock.

"Subsidiaries" (or "Subsidiary" as the context may require) shall mean each entity as to which the Company, directly or indirectly, owns or has the power to vote, or to exercise a controlling influence with respect to, fifty percent (50%) or more of the securities of any class of such entity the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such entity.

"Third Party" shall mean, as to any Person, any Person other than an Affiliate of such Person.

"Transfer" shall mean any direct or indirect transfer, other than in the form of an Involuntary Transfer, of any right, title or interest in and to any of the Shares to any Person, whether in the form of a sale, assignment, gift, bequest, exchange of property, conveyance, pledge, encumbrance or any other form of disposition.

"Transferor" shall have the meaning set forth in Section 2.7(a) of this Agreement.

"Transferred Shares" shall have the meaning set forth in Section 2.5(a) of this Agreement.


Article 2.    TRANSFER OF SHARES.

2.1    Legends.  Each certificate evidencing Shares shall bear the following legends:

"The securities evidenced hereby are subject to the terms of that Stockholders Agreement, dated as of August 31, 2000, among the Company and certain shareholders identified therein.  A copy of the Stockholders Agreement is on file at the office of the Company and is available upon request.  The Stockholders Agreement provides, among other things, for certain restrictions on the issuance, sale, transfer, pledge, hypothecation or other disposition of the securities evidenced hereby."

NYB 465538 06432 00653

—5—

"The securities evidenced hereby have not been registered under the Securities Act of 1933, as amended, or any state securities or blue sky laws and may only be transferred in compliance with such laws."

2.2     After-Acquired Shares.  The provisions of this Agreement shall apply to all of the shares of Common Stock now owned or hereafter acquired by the Shareholders and to any issuance or transfer by the Company of any shares of Common Stock or any options, warrants or any form of debt or equity convertible into shares of Common Stock, except for any option or stock issued pursuant to the Company's employee stock option plan.

2.3     Transfers - Compliance With Agreement.  During the term of this Agreement, no Shareholder shall, directly or indirectly, Transfer the Shares now owned or hereafter acquired by it, except as permitted by, and in compliance with, the terms and conditions of this Agreement and in accordance with any applicable laws.  Any purported Transfer not in compliance with the terms and conditions of this Agreement shall be void and of no force and effect.

2.4     Shareholder Transfers - Acceptance of Agreement.  Each Shareholder shall have the right to Transfer Shares to (a) an Affiliate at any time or (b) any Third Party upon the written consent of all of the other non-transferring Shareholders or in compliance with the terms and conditions of this Agreement; provided, however, that no Transfer (whether to an Affiliate or to a Third Party) shall be allowed until such time as the proposed transferee agrees in writing to be bound by the terms and conditions of this Agreement.

2.5     Involuntary Transfer of Shares.

(a)  Company's Option.  If an Involuntary Transfer of any of the Shares owned by any Shareholder (the "Transferred Shares") shall occur, the Company shall have the right to purchase some or all of the Transferred Shares, which right shall be exercisable by written notice given to the transferee of the Transferred Shares (the "Involuntary Transferee") and the Shareholder who suffered the Involuntary Transfer (the "Involuntary Transferor") within thirty (30) days after receipt by the Company of written notice of the Involuntary Transfer (or, in the event no such notice is received, thirty (30) days after the Company becomes aware of the Involuntary Transfer).  The Company shall provide to each other Shareholder (a "Continuing Shareholder") (i) a copy of any written notice of Involuntary Transfer received by the Company (or, in the event no such notice is received, a written notice of awareness of any Involuntary Transfer), within five (5) days after the Company becomes aware of the Involuntary Transfer, and (ii) a copy of any written notice of exercise given by the Company pursuant to this Section 2.5(a).  The failure of the Company to exercise such right within such thirty (30) day time period shall be regarded as a waiver of its right to participate in the purchase of the Transferred Shares.

NYB 465538  06432 00653

(b) <u>Continuing Shareholders' Option</u>.  If the Company does not elect to purchase all of the Transferred Shares as provided herein, each Continuing Shareholder shall have the right to purchase any portion of the Transferred Shares for which no such election has been made by the Company (the "Excess Transferred Shares") pro rata based on the number of Shares owned by the Shareholders which exercise the right, which right shall be exercisable by written notice to the Involuntary Transferee and Involuntary Transferor given within forty-five (45) days after receipt by such Continuing Shareholder of written notice of the Involuntary Transfer from the Company.  The exercising Continuing Shareholder shall also provide a copy of such written notice of exercise to the Company and the other Continuing Shareholders.  A Continuing Shareholder may also indicate in such notice, if it so elects, its desire to purchase additional Excess Transferred Shares (indicating a maximum number, if any) if any other Continuing Shareholder does not exercise its right to purchase up to the full amount of its pro rata share of the Excess Transferred Shares.  If one or more Continuing Shareholders so elect, the additional Excess Transferred Shares, if any, shall be allocated (pro rata if more than one, or less than pro rata with respect to any such Continuing Shareholder requesting a lower number of Excess Transferred Shares) to such Continuing Shareholder(s).  The failure of a Continuing Shareholder to exercise such right within such forty-five (45) day period shall be regarded as a waiver of its right to participate in the purchase of the Transferred Shares.

(c) <u>Purchase Price for Transferred Shares</u>.  The purchase price per share of any Transferred Shares shall be the "fair market value" thereof as determined by mutual agreement of the Involuntary Transferee and each party participating in such purchase, or if no such agreement can be reached within thirty (30) days after the commencement of the forty-five (45) day period provided in Section 2.5(b), the purchase price shall be determined in accordance with the provisions of Section 2.5(e).  The Company and the Continuing Shareholders shall pay the purchase price for the Transferred Shares in cash, in full, within thirty (30) days after the purchase price is determined.

(d) <u>First Refusal Rights Survive</u>.  In the event the provisions of this Section 2.5 shall be held to be unenforceable with respect to any particular Involuntary Transfer of any Shares, each Continuing Shareholder and the Company shall have rights of first refusal if the Involuntary Transferee subsequently obtains a bona fide offer for and desires to transfer such Shares.

(e) <u>Determination of Fair Market Value</u>.  For the purposes of this Section 2.5, the "fair market value" of the Transferred Shares shall be determined, in the absence of mutual agreement, by an investment banking firm (the "Consultant") reasonably satisfactory to each party participating in the transaction.  If each such party shall not agree upon a Consultant within the earliest of (i) thirty (30) days after the delivery of the last applicable written notice from a Continuing Shareholder or the Company with respect to such purchase and sale, (ii) fifteen (15) days after such parties notify the Company in writing that mutual agreement on such Consultant cannot be reached, or (iii) fifteen (15) days after the expiration of the thirty (30) day period provided in Section 2.5(c), the Company's auditors shall select a Consultant.  The Consultant shall determine the purchase price as follows:  each

party participating in the transaction shall provide to the Consultant in a sealed envelope its opinion of the "fair market value" of the Transferred Shares (its "Opinion") within three (3) Business Days after retention of the Consultant; the Consultant shall consider the Opinions and shall choose the one the Consultant considers closest to the fair market value of the Transferred Shares; the Opinion so chosen by the Consultant shall be the "fair market value," and therefore the purchase price of the Transferred Shares.  Such determination by the Consultant shall be final and binding upon all parties to the purchase and sale.  The fees of the Consultant shall be paid by the Company.

      (f)  <u>No Prejudice</u>.  If the Company or any Shareholder at any time fails to exercise its right to repurchase in accordance with this Section 2.5, the Company or such Shareholder shall in no way be precluded from (i) exercising in connection with any subsequent Involuntary Transfer its right to repurchase pursuant to this Section 2.5 with respect to the Shares in question or any other Shares or (ii) exercising its rights to repurchase generally in accordance with the provisions of this Article 2 with respect to any other Transfer of any Shares.

    2.6    <u>Right of First Refusal</u>.

      (a)  <u>Proposed Transfer of Shares</u>.  Any Shareholder which desires to transfer all or any of its Shares (the "Offering Shareholder") to any Third Party shall first make an offer (the "Offer") to transfer the Shares (the "Offered Shares") to the Company and, if the Company does not elect to purchase all of the Offered Shares, then to each other Shareholder (a "Non-Offering Shareholder") pursuant to the provisions of this Section 2.6.

      (b)  <u>Offer to Company and Other Shareholders</u>.  The Offering Shareholder shall send written notice of the Offer (the "Offering Shareholder's Notice") to the Company and to each Non-Offering Shareholder within ten (10) Business Days following receipt of an offer for such Offered Shares from, or a making of an offer with respect to the Offered Shares to, a Third Party.  In addition to any other information required to be provided by the Offering Shareholder pursuant to the immediately following sentence, the Offering Shareholder's Notice shall state the number of Offered Shares, the terms and conditions of the Offer, and the name and address of the Third Party (together with a copy of all writings between the Third Party and the Offering Shareholder establishing the terms of the offer between such parties) and shall include a description of any related transactions, understandings or relationships or a statement that there are no such related items.  The Offering Shareholder shall also include with the Offering Shareholder's Notice a valuation prepared in good faith by the Offering Shareholder (the "Offering Shareholder Valuation") of the "fair market value" of any non-cash consideration offered by the Third Party in connection with its offer for the Offered Shares.  The Offer shall be on the same terms and conditions as the offer from, or made by the Offering Shareholder to, the Third Party.

      (c)  <u>Company's Option</u>.  Upon receipt of the Offering Shareholder's Notice, the Company shall have the right to purchase some or all of the Offered Shares at the price and

upon the terms and conditions specified in such notice; provided, however, that the Company may pay cash to the Offering Shareholder equal in amount to the "fair market value" (as determined in accordance with the provisions of Section 2.6(e)) of any non-cash consideration offered by the Third Party for the Offered Shares purchased by the Company. Notice of election to purchase the Offered Shares shall be given by the Company to the Offering Shareholder and to each Non-Offering Shareholder within thirty (30) days after receipt by the Company of the Offering Shareholders' Notice. The failure of the Company to exercise its right to purchase the Offered Shares within such thirty (30) day period shall be regarded as a waiver of its right to participate in the purchase of the Offered Shares.

(d) Non-Offering Shareholder's Option. If the Company does not elect to purchase all of the Offered Shares, each of the Non-Offering Shareholders shall have the right to purchase any portion of the Offered Shares, pro rata based on the number of Shares owned by the Non-Offering Shareholders who exercise the right, for which no such election has been made (the "Excess Offered Shares") at the price and upon the terms and conditions specified in the Offering Shareholder's Notice; provided, however, that the Non-Offering Shareholders may pay cash to the Offering Shareholder equal in amount to the "fair market value" (as determined in accordance with the provisions of Section 2.6(e)) of any non-cash consideration offered by the Third Party for the Offered Shares purchased by the Non-Offering Shareholders. A Non-Offering Shareholder's right to purchase Excess Offered Shares shall be exercisable by written notice of exercise to the Offering Shareholder given within forty-five (45) days after receipt of the Offering Shareholder's Notice. The exercising Non-Offering Shareholder shall also provide a copy of such written notice to the Company and the other Non-Offering Shareholders. A Non-Offering Shareholder may also indicate in such notice, if it so elects, its desire to purchase additional Excess Offered Shares (indicating a maximum number, if any) if any other Non-Offering Shareholder does not exercise its right to purchase up to the full amount of its pro rata amount of the Excess Offered Shares. If one or more of the Non-Offering Shareholders so elect, the additional Excess Transferred Shares, if any, shall be allocated (pro rata if more than one, or less than pro rata with respect to any such Non-Offering Shareholder requesting a lower number of Excess Transferred Shares) to such Non-Offering Shareholder(s). The failure of a Non-Offering Shareholder to exercise such right within such forty-five (45) day period shall be regarded as a waiver of its right to participate in the purchase of the Offered Shares.

(e) Determination of Value of Non-Cash Consideration. The "fair market value" of any non-cash consideration offered by the Third Party in connection with its offer for the Offered Shares shall be determined by the mutual agreement of the Offering Shareholder and each party participating in the purchase of the Offered Shares. If no such agreement can be reached within thirty (30) days after the commencement of the forty-five (45) day period provided in Section 2.6(d) (or, if the Company elects to purchase all of the Offered Shares, the thirty (30) day period provided in Section 2.6(c)), the "fair market value" of the non-cash consideration shall be determined by an investment banking firm (the "Advisor") reasonably satisfactory to each party participating in the transaction. If each such party shall not agree upon an Advisor within the earliest of (i) thirty (30) days after the

delivery of the last applicable written notice from the Company or a Non-Offering Shareholder with respect to such purchase and sale, (ii) fifteen (15) days after such parties notify the Company in writing that mutual agreement on such Advisor cannot be reached, or (iii) fifteen (15) days after the expiration of the thirty (30) day period provided in the second sentence of this Section 2.6(e), the Company's auditors shall select an Advisor. The Advisor shall determine the "fair market value" of any non-cash consideration offered by the Third Party as follows: each party participating in the transaction (other than the Offering Shareholder) shall provide to the Advisor in a sealed envelope its opinion of the "fair market value" of such non-cash consideration (each, a "Section 2.6(e) Valuation") within three (3) Business Days after retention of the Advisor; the Advisor shall consider the Offering Shareholder Valuation and the Section 2.6(e) Valuations and shall choose the one the Advisor considers closest to the fair market value of such non-cash consideration; the valuation so chosen by the Advisor shall be the "fair market value" of such non-cash consideration. Such determination by the Advisor shall be final and binding upon all parties to the purchase and sale. The fees of the Advisor shall be paid by the Company.

(f) <u>Surrender of Certificates</u>. At such time as the Company and the Non-Offering Shareholders have agreed to purchase, in the aggregate, all of the Offered Shares, the Offering Shareholder shall surrender its certificate(s) representing the Offered Shares to the Company with duly executed assignments, and the purchasers shall concurrently and therewith pay the Offering Shareholder the purchase price of the Shares.

(g) <u>Shareholder Obligation</u>. Unless waived by the Offering Shareholder, the Offering Shareholder shall not be obligated to sell any of the Offered Shares to the Company or the Non-Offering Shareholders unless all of the Offered Shares are purchased.

(h) <u>Sale</u>. Unless the Company and/or the Non-Offering Shareholders elect to purchase all of the Offered Shares, the Offering Shareholder may convey, subject to the provisions of this Agreement, the Offered Shares on the terms and conditions set forth in the Offering Shareholder's Notice delivered to the Company and the Non-Offering Shareholders, provided that such sale is consummated within one hundred and twenty (120) days of the date of the Offering Shareholder's Notice. In accordance with Section 2.4, the purchasing Third Party shall agree to be bound by the terms and provisions of this Agreement before the Company shall be required to reflect the Transfer on its stock transfer records. If such sale is not consummated within such one hundred and twenty (120) day period, all of the restrictions of this Agreement shall again become effective with respect to the Offered Shares.

2.7    <u>Tag-Along Rights</u>.

Except as provided in Section 2.7(c) hereof, no Shareholder shall Transfer Shares to a Third Party without complying with the terms and conditions set forth in Sections 2.7(a) and 2.7(b) below.

(a)  Any Shareholder, when desiring to Transfer such Shares (the "Transferor"), shall give not less than ten (10) days prior written notice of such intended Transfer to each other Shareholder and to the Company. Such notice (the "Participation Notice") shall set forth the terms and conditions of such proposed Transfer, including the name of the prospective transferee, the number of Shares proposed to be transferred (the "Participation Securities") by the Transferor, the purchase price per Share proposed to be paid therefor and the payment terms and type of Transfer to be effectuated. Within ten (10) days following the delivery of the Participation Notice by the Transferor to each other Shareholder and to the Company, each Shareholder desiring to participate in such proposed Transfer (each a "Participating Offeree") shall, by notice in writing to the Transferor and to the Company, have the opportunity and right to sell to the purchasers in such proposed Transfer (upon substantially the same terms and conditions as the Transferor) that number of Shares owned by such Participating Offeree as shall equal the product of (i) a fraction, the numerator of which is the number of Shares proposed to be transferred by the Transferor as of the date of such Participation Notice and the denominator of which is the aggregate number of Shares actually owned as of the date of such Participation Notice by the Transferor, multiplied by (ii) the number of Shares actually owned as of the date of such Participation Notice by such Participating Offeree.

(b)  At the closing of any proposed Transfer in respect of which a Participation Notice has been delivered, the Transferor, together with all Participating Offerees, shall deliver to the proposed transferee certificates evidencing the Shares to be sold thereto (duly endorsed or with duly executed stock powers) and shall receive in exchange therefor the consideration to be paid or delivered by the proposed transferee in respect of such Shares as described in the Participation Notice.

(c)  The provisions of this Section 2.7 shall not apply to (i) any Transfer to an Affiliate of a Shareholder, (ii) any Transfer pursuant to or following a public offering, (iii) any Transfer in accordance with Section 2.5, 2.6 or 2.8 hereof, (iv) any Transfer in accordance with Sections 9 or 10 of the LLGM Warrant or the Litchfield Warrant.

2.8    Drag-Along Rights.

(a)  If the Founders determine to sell or exchange (in a business combination or otherwise), in one or a series of bona fide arms-length transactions to a Third Party who is not an Affiliate of the Founders, Shares representing more than fifty percent (50%) of the outstanding shares of Common Stock on a Fully Diluted basis, then, upon fifteen (15) days written notice by the Founders to each other Shareholder, which notice shall include reasonable details of the proposed sale or exchange including the proposed time and place of closing and the consideration to be received by the Founders (such notice being referred to as the "Sale Request"), each other Shareholder (each, a "Seller") shall be obligated to, and shall sell, transfer and deliver, or cause to be sold, transferred and delivered, to such Third Party on substantially the same terms as the Founders, that number of Shares owned by such Seller as shall equal the product of (i) a fraction, the numerator of which is the number of Shares

proposed to be transferred by the Founders as of the date of such Sale Request and the denominator of which is the aggregate number of Shares actually owned as of the date of such Sale Request by the Founders, multiplied by (ii) the number of Shares actually owned as of the date of such Sale Request by such Seller.  Notwithstanding the foregoing, Litchfield and LLGM shall each have the right (as a condition precedent to their obligation to sell any Shares pursuant to this Section 2.8) to cause to be included pursuant to such proposed Transfer all of the Shares owned by Litchfield and LLGM as of the date of such Sale Request.  Each Seller shall (A) deliver certificates for all of its Shares at the closing of the proposed Transfer, free and clear of all claims, liens and encumbrances and (B) if stockholder approval of the transaction is required, vote its shares of Common Stock in favor thereof.

       (b)    The provisions of this Section 2.8 shall not apply to (i) any Transfer to an Affiliate of a Shareholder, (ii) any Transfer pursuant to or following a public offering, (iii) any Transfer in accordance with Section 2.5, 2.6 or 2.7 hereof, or (iv) any Transfer in accordance with Section 9 or 10 of the LLGM Warrant or the Litchfield Warrant.

     2.9     <u>Transfers by Founders</u>.

       In the event any of the Founders Transfer any of his respective Shares during a period in which the Company is in default of any monetary obligation due in respect of the Litchfield Note, then such Founder shall be required to use the proceeds of such Transfer to satisfy the monetary obligation of the Company to the holder of the Litchfield Note.  To secure the obligations of the Founders to the holder of the Litchfield Note pursuant to this Section 2.9, each of the Founders hereby grants to the holder of the Litchfield Note a security interest in the proceeds of any Transfer of any of his respective Shares.  Each of the Founders, as debtor, has executed and delivered to the holder of the Litchfield Note, as secured party, Financing Statements on Form UCC-1 to perfect such security interest.

     2.10    <u>Salary Increases and Bonuses for the Founders and Certain Officers</u>.

       In the event the Company (a) is in default for the overdue payment of interest due under the Litchfield Note and such default is not cured within forty-five (45) days from the date such interest payment is due and owed, (b) is in default for the overdue payment of principal due under the Litchfield Note and such defaults is not cured within nine (9) months from the date such principal payment is due and owed, or (c) has not paid the Put Price (as defined in the Litchfield Warrant and the LLGM Warrant), together with all accrued interest thereon, within nine (9) months after such payment becomes due and owing in accordance with Section 3 of the Litchfield Warrant and the LLGM Warrant, then the Shareholders agree that the Company shall not, without the prior written consent of Litchfield, which consent shall be deemed to be given upon receipt of the written consent of any member of Litchfield, grant any bonuses to, make loans or advances to or increase the salary of, the Founders or any senior officer of the Company who owns five percent (5%) or more of the outstanding capital stock of the Company, until such payment of interest, principal or Put Price, as the case may be, is satisfied.

Article 3.     PREEMPTIVE RIGHTS.

In the event that the Company shall issue additional shares of any class of equity securities (or any securities convertible into or exchangeable for equity securities) at any time prior to the termination of this Agreement (other than any shares issued or offered in a public offering registered under the Securities Act or any shares issued upon exercise of the Litchfield Warrant or the LLGM Warrant) (the "Additional Shares"), the Company shall, upon written notice to each of the Shareholders, given at least thirty (30) days prior to such issuance, offer to each Shareholder the right to purchase such number of Additional Shares as may be necessary to maintain the Shareholder's percentage ownership in the Company as calculated immediately prior to such issuance of the Additional Shares. Each Shareholder shall advise the Company in writing within fifteen (15) days after the date of receipt of such offer from the Company, setting forth the amount of such Additional Shares for which issuance is requested, and the Company shall thereupon include in such issuance the number of Additional Shares for which issuance is so requested.

Article 4.     BOARD OF DIRECTORS.

4.1     Composition of Board of Directors.  The Company Board shall be comprised of three (3) directors.  Directors shall be elected in accordance with the By-Laws; provided, however, that for so long as Litchfield shall hold either the Litchfield Warrant or any shares of Common Stock of the Company issued upon exercise of such Litchfield Warrant, one (1) director shall be designated by Litchfield.  From and after the date hereof, the Shareholders and the Company shall take all actions within their respective powers, including, but not limited to, the voting of all Shares owned by them, required to cause the Board to be constituted as set forth above.

Article 5.     OTHER AGREEMENTS AND COVENANTS.

5.1     Financial Statements.  The Company will make available to each Shareholder:

(i)     as soon as practicable and in any event within thirty (30) days after the end of each quarterly period (other than the last quarterly period of each fiscal year) in each fiscal year, consolidated statements of income, changes in shareholders' equity and cash flow of the Company for such quarterly period and for the period from the beginning of the current fiscal year to the end of such quarterly period and a consolidated balance sheet of the Company as at the end of such quarterly period, setting forth in each case in comparative form figures, if any, for the corresponding period in the preceding fiscal year, all in reasonable detail and reasonably satisfactory in scope to the Shareholders and prepared in accordance with generally accepted accounting principles

applied on a basis consistent with past practice, and in each case certi-
fied by an officer of the Company as fairly presenting the financial
condition of the Company and its Subsidiaries, subject to changes
resulting from audit and normal year-end adjustments;

(ii)     as soon as practicable and in any event within ninety (90) days after the
end of each fiscal year, consolidated statements of income, changes in
shareholders' equity and cash flow of the Company for such year, and a
consolidated balance sheet of the Company as at the end of such year,
setting forth in each case in comparative form corresponding figures, if
any, from the preceding annual audit, all in reasonable detail and
reasonably satisfactory in scope to the Shareholders, and in each case
accompanied by a report thereon of independent public accountants
selected by the Company and reasonably acceptable to the Shareholders,
which report in each case shall state that such consolidated financial
statements present fairly the results of operations and cash flows and the
financial condition of the Company and its subsidiaries in accordance
with generally accepted accounting principles applied on a basis consis-
tent with prior years (except as otherwise specified in such report) and
that the examination by such accountants has been made in accordance
with generally accepted auditing standards;

(iii)    promptly upon transmission thereof, copies of all financial statements,
information circulars, proxy statements and reports as the Company or
any Subsidiary thereof shall send to its shareholders or creditors, and
copies of all press releases and other statements made available
generally by the Company to the public; and

(iv)    such other information as any Shareholder may reasonably request.

5.2    Books and Records; Inspection of Property.  The Company will keep proper
books of record and account in which full, true and correct entries in conformity in all material
respects with generally accepted accounting principles shall be made of all dealings and
transactions in relation to its business and activities.  Within business hours and in the normal
course of business, the Company and the Subsidiaries will permit any Person representing any
Shareholder and designated in writing by such Shareholder to visit and inspect any of the
properties of the Company, to examine the corporate, financial and operating records of the
Company and make copies thereof or extracts therefrom and to discuss the affairs, finances
and accounts with the directors, officers and independent accountants of the Company, all at
such reasonable times, upon reasonable notice and as often as any Shareholder may reasonably
request.  Each Shareholder agrees to cause any such Person representing such Shareholder, to
the extent reasonably requested by the Company, to execute a confidentiality agreement in
form and substance reasonably satisfactory to the Company, containing the agreement of such

Person to keep confidential any confidential information of the Company acquired in connection with any such visit, inspection, examination or discussion.

    5.3    <u>Cooperation</u>.

        (a)    If any Shareholder shall be required by any governmental authority, by reason of its ownership of Shares, to file with such governmental authority any information which is not publicly available, and such requirement would not exist but for the nature of the Shareholder's ownership of Shares, the Company and the Shareholders agree to take reasonable steps to assist such Shareholder in the compliance with such filing requirement; it being understood that neither the Company nor the Shareholders not subject to such filing requirement shall be obligated to suffer any economic or other disadvantage, or surrender or reduce any right, to accommodate the request of the Shareholder subject to such filing requirement.

        (b)    The Shareholders shall act together so that the Certificate of Incorporation and By-Laws of the Company shall contain provisions required by, or necessary or appropriate to implement the provisions of, this Agreement.

Article 6.    <u>MISCELLANEOUS PROVISIONS</u>.

    6.1    <u>Amendments</u>.  This Agreement may be amended only upon the written consent of the Shareholders owning eighty-one percent (81%) of the outstanding Shares; <u>provided</u>, <u>however</u>, that no amendment which would have, or could reasonably be likely to have, a material adverse effect on the rights, obligations or tax treatment of a Shareholder shall be effective without the consent of such Shareholder.

    6.2    <u>Term</u>.  This Agreement shall terminate upon the first to occur of (a) the consent of the Company and all Shareholders which are parties to this Agreement that the Agreement be terminated, or (b) the liquidation or dissolution of the Company; <u>provided</u>, <u>however</u>, that upon the consummation of an Initial Public Offering, the provisions contained in Articles 2, 3, 4 and 5 of this Agreement shall terminate and be of no further force and effect.

    6.3    <u>Successors; Beneficiaries</u>.  Subject to the terms and conditions hereof, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors, legal representatives and heirs.  The Company and the Shareholders agree and acknowledge that Litchfield and LLGM, as holders of the Litchfield Warrant and the LLGM Warrant, shall be and are hereby deemed to be, third party beneficiaries of this Agreement.

    6.4    <u>Applicable Law</u>.  THE PARTIES HERETO AGREE THAT THIS AGREEMENT SHALL BE CONSTRUED, ENFORCED AND GOVERNED BY THE

LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO THE PRINCIPLES OF THE LAWS OF CONFLICTS.

    6.5   <u>Intentionally Omitted</u>.

    6.6   <u>Jurisdiction</u>. THE PARTIES HERETO AGREE THAT THE STATE AND FEDERAL COURT OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE SHAREHOLDERS AND THE COMPANY PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT AND ALL DOCUMENTS, INSTRUMENTS AND AGREEMENTS EXECUTED PURSUANT HERETO, OR TO ANY MATTER ARISING THEREFROM (UNLESS OTHERWISE EXPRESSLY PROVIDED FOR THEREIN). TO THE EXTENT PERMITTED BY LAW, THE COMPANY AND THE SHAREHOLDERS BY ACCEPTANCE HEREOF, EACH HEREBY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY THE COMPANY OR ANY SHAREHOLDER IN ANY OF SUCH COURTS. THE EXCLUSIVE CHOICE OF FORUM SET FORTH IN THIS SECTION 6.6 SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT OF ANY JUDGMENT OBTAINED IN SUCH FORUM OR THE TAKING OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION.

    6.7   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all such counterparts together constitute one and the same instrument.

    6.8   <u>Entire Agreement</u>. This Agreement, together with the Other Transaction Documents, constitutes the entire Agreement and understanding of the parties hereto in respect of the subject matter contained herein, and there are no restrictions, promises, representations, warranties, covenants or undertakings with respect of the subject matter hereof, other than those expressly set forth or referred to herein. This Agreement, together with the Other Transaction Documents, supersedes all other prior agreements and understandings between the parties hereto with respect to the subject matter hereof. In the event that after the date hereof any further action by any party hereto is necessary to carry out all the provisions of this Agreement, each party shall take all of the necessary actions. This Agreement may only be modified or amended pursuant to Section 6.1 by an instrument in writing making express reference to this Agreement, expressly stating that it is an amendment to this Agreement and signed by or on behalf of the Shareholders owning the requisite number of Shares or whose particular consent is required, as the case may be. So long as any Warrants under the Litchfield Warrant or the LLGM Warrant are outstanding, to the extent any provisions contained therein conflict with the provisions of this Agreement, the provisions contained in the Litchfield Warrant or the LLGM Warrant, as applicable, shall govern.

    6.9   <u>Conflicts with Certificate of Incorporation or By-Laws</u>. In the event of any conflict between this Agreement and the Company's Certificate of Incorporation or By-Laws,

NYB 465538 06432 00653

the parties will take such action as may be necessary and appropriate consistent with applicable law to ensure that the provisions of this Agreement will prevail.

6.10   <u>Severability</u>.  The invalidity, illegality or unenforceability of one or more of the provisions of this Agreement in any jurisdiction shall not effect the validity, legality, or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of this Agreement, including any such provision, in any other jurisdiction; it being intended that all rights and obligations hereunder shall be enforceable to the fullest extent permitted by law.

6.11   <u>Cost and Expenses</u>.  In the event of any action, suit or proceeding for, under or in connection with this Agreement, the prevailing parties herein shall be entitled to recover, and the other party or parties hereto agree to pay, the prevailing parties' cost and expenses in connection therewith, including reasonable attorneys' fees.

6.12   <u>Waiver and Consent</u>.  No waiver by any party hereto of the breach of any provision of this Agreement shall operate or be construed as a waiver of any preceding or succeeding breach, whether of like or different nature, or shall be effective unless in a writing signed by the party granting such waiver.  The failure by any party to exercise any right or privilege hereunder shall not be deemed a waiver of such party's rights to exercise the same at any subsequent time or times.

6.13   <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be given to the Person either personally or by sending a copy thereof by first class or express mail, postage prepaid, or by telegram (with messenger service specified), or by courier services, charges prepaid, or by telecopier, to such party's address (or to such party's telecopier number set forth below:

            If to the Company, to:

                  TRIumph Health, Inc.
                  12834 Amberwoods Way
                  Sykesville, Maryland 21784
                  Attention: Francis P. Kirley
                  Telecopy:  410-442-5143

            With a copy to:

                  LeBoeuf, Lamb, Greene & MacRae, L.L.P.
                  125 West 55th Street
                  New York, New York 10019
                  Attention: John R.  Fallon, Jr., Esquire
                  Telecopy: 212-424-8500

            If to any of the other Shareholders, to the address of such Shareholder as reflected in the stock records of the Company.

Any may change the address to which these notices are to be given by providing all of the parties notice in the manner set forth herein.

6.14   Confidentiality.

(a)   Each party hereto shall keep confidential and shall not disclose to any Person not party to this Agreement or use any of the terms and conditions of this Agreement and any confidential information which it has obtained or will obtain from the other parties hereto, unless it is necessary to carry out the transactions contemplated hereunder or a prior written consent has been obtained from the non-disclosing parties.

(b)   Nothing in this Agreement shall prevent a party hereto from using or disclosing information belonging to another party hereto or from making any announcement or any communication which such party is required to make by law or by any stock exchange or other regulatory body or which is necessary for tax or accounting purposes (provided that such party shall engage in such consultation with the other parties hereto as shall be reasonable) or which it makes to its advisers for the purpose of obtaining advice or for enforcing this Agreement.

## SIGNATURE PAGE FOLLOWS

IN WITNESS WHEREOF, the parties have executed this Stockholders Agreement as of the date first written.

**THE COMPANY:**

TRIUMPH HEALTH, INC.

By: _____
Name:  Francis P. Kirley
Title:   President

**THE SHAREHOLDERS:**

_____
Francis P. Kirley

_____
Bretton J. Bolt

## SCHEDULE 1

|     Shareholder     | Common Stock |
| --- | --- |
| Francis P. Kirley | 400,000 |
| Bretton J. Bolt | 220,000 |